1
2
3
4
5
6
7
8          UNITED STATES DISTRICT COURT
9          NORTHERN DISTRICT OF CALIFORNIA
10

United States District Court
Northern District of California

11   MARK ANTHONY FREGIA,                    Case No.  11-3595 WHO (PR)
                Petitioner,
12                                           **ORDER DENYING PETITION FOR
          v.                                 WRIT OF HABEAS CORPUS;
13                                           DENYING CERTIFICATE OF
                                             APPEALABILITY**
14   MIKE McDONALD, Warden,
15                Respondent.
16
17

18                          **INTRODUCTION**
19          Petitioner Mark Anthony Fregia seeks federal habeas relief from his state
20   convictions.  For the reasons set forth below, the petition for such relief is DENIED.
21                          **BACKGROUND**
22          In 2007, a Contra Costa County Superior Court jury found Fregia guilty of
23   kidnapping, carjacking, mayhem, arson, attempted manslaughter, and two counts of felony
24   murder.  Fregia received a sentence of life in prison without the possibility of parole and
25   an additional determinate term of 59 years and four months.  On direct appeal, the
26   California Court of Appeal affirmed the conviction, and the California Supreme Court
27   denied review.  Fregia filed a series of state habeas petitions, and the California Supreme
28   Court summarily denied the final state petition on May 9, 2012.  This federal habeas action

United States District Court
Northern District of California

1    followed.[1]

2        Evidence presented at trial showed that Fregia became romantically involved with

3    Erin Weaver in 2000, and they later had a son, Daelin.  Weaver also had a daughter,

4    Devlin, from a prior relationship.  In the summer of 2002, Weaver left Fregia because he

5    was physically abusive.  Fregia continued to be involved in Weaver's life because of his

6    jealousy over Weaver seeing other men and his claim on Daelin.  On December 18, 2003,

7    Fregia lured Weaver and the two children into his car on the pretense of taking them to

8    Toys R Us to buy Christmas presents; at the time, Devlin was six years old and Daelin was

9    two years old.  When it became obvious to Weaver that Fregia was driving them

10   elsewhere, she demanded he stop the car and let them out.  As he drove on the freeway,

11   Fregia poured gasoline onto Weaver's head and body and lit her on fire with a cigarette

12   lighter.  While on fire, Weaver yanked the steering wheel and managed to get the car to

13   slow down, allowing her to jump out and roll on the ground to extinguish the flames.

14   When she returned to the car to rescue her children, the fire inside the car was too intense.

15   Fregia, who exited the car at the same time as Weaver, did not try to help her or the

16   children.  Fregia fled scene by carjacking a vehicle of a motorist who had stopped to assist

17   them.  (Cal. Ct. App. Opinion ("Op."), pp. 2-4; Ans. Ex. 5.)

18       Weaver suffered second and third degree burns on over 85 percent of her body, and

19   she remained in the hospital for nine months.  At the time of the trial, Weaver had

20   undergone 70 surgeries and was still far from healed.  The autopsies of the children

21   showed that they had died from massive burns and carbon monoxide inhalation.  (Op. at

22   5.)

23       The case was tried as a death penalty case.  Fregia testified in his own defense at

24   trial, asserting that he only wanted to "terrorize" Weaver and did not intend to ignite the

25

26   [1] The matter was stayed pending Fregia's exhaustion of all claims in the state courts, (*see*
     Docket No. 13), and then reopened on June 6, 2012, (*see* Docket No. 16).  The case was
27   reassigned to this Court on June 27, 2013.

28                                                2

gasoline or kill her, apparently wanting to avoid any conviction or enhancements that required a specific intent. (Op. at 2.) In the closing argument at the guilt phase, the defense conceded that there was "more than adequate" evidence to convict Fregia of the first degree felony murders of the children and that he "should spend the rest of his life in prison." (*Id.*) The jury convicted Frejia of the murders of the children with special circumstances for multiple murder, among other charges. After the penalty phase, the jury declined to impose the death penalty and returned verdicts of life without the possibility of parole.

As grounds for federal habeas relief, Fregia claims that: (1) the trial court erred in denying his *Batson/Wheeler*[2] motion, thereby violating his right to an impartial jury; and (2) the prosecution engaged in misconduct.

## STANDARD OF REVIEW

Under the Anti-Terrorism and Effective Death Penalty Act of 1996 ("AEDPA"), this Court may entertain a petition for writ of habeas corpus "in behalf of a person in custody pursuant to the judgment of a State court only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a). The petition may not be granted with respect to any claim that was adjudicated on the merits in state court unless the state court's adjudication of the claim: "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d).

---

[2] In *People v. Wheeler*, 22 Cal. 3d 258, 276-77 (1978), disapproved on another ground in *Johnson v. California*, 545 U.S. 162, 166-68 (2005), the California Supreme Court established a procedure and an evidentiary burden for raising a racial discrimination claim, which are comparable to those later adopted in *Batson v. Kentucky*, 476 U.S. 79, 95-96 (1986). *Compare Wheeler*, 22 Cal. 3d at 280, with *Batson*, 476 U.S. at 96. The Ninth Circuit has held that "a *Wheeler* motion is the procedural equivalent of a *Batson* challenge in California." *Paulino v.Castro*, 371 F.3d 1084, 1088 (2004).

1    "Under the 'contrary to' clause, a federal habeas court may grant the writ if the state

2    court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question

3    of law or if the state court decides a case differently than [the] Court has on a set of

4    materially indistinguishable facts." *Williams (Terry) v. Taylor*, 529 U.S. 362, 412–13

5    (2000).

6         "Under the 'unreasonable application' clause, a federal habeas court may grant the

7    writ if the state court identifies the correct governing legal principle from [the] Court's

8    decisions but unreasonably applies that principle to the facts of the prisoner's case." *Id.* at

9    413. "[A] federal habeas court may not issue the writ simply because that court concludes

10   in its independent judgment that the relevant state-court decision applied clearly

11   established federal law erroneously or incorrectly. Rather, that application must also be

12   unreasonable." *Id.* at 411. A federal habeas court making the "unreasonable application"

13   inquiry should ask whether the state court's application of clearly established federal law

14   was "objectively unreasonable." *Id.* at 409.

15        This Court must presume correct any determination of a factual issue made by a

16   state court unless the petitioner rebuts the presumption of correctness by clear and

17   convincing evidence. 28 U.S.C. § 2254(e)(1). It is error for a federal court to review *de*

18   *novo* a claim that was adjudicated on the merits in state court. *See Price v. Vincent*, 538

19   U.S. 634, 638-43 (2003) (reversing judgment of 6th Circuit granting habeas relief on *de*

20   *novo* review where claims did not meet standards for relief under § 2254(d)(1)). A state

21   court has "adjudicated" a petitioner's constitutional claim "on the merits" for purposes of §

22   2254(d) when it has decided the petitioner's right to post-conviction relief on the basis of

23   the substance of the constitutional claim advanced, rather than denying the claim on the

24   basis of a procedural or other rule precluding state court review on the merits. *Barker v.*

25   *Fleming*, 423 F.3d 1085, 1092 (9th Cir. 2005); *Lambert v. Blodgett*, 393 F.3d 943, 969 (9th

26   Cir. 2004). A petitioner must present clear and convincing evidence to overcome the

27   presumption of correctness; conclusory assertions will not do. *Taylor v. Maddox*, 366 F.3d

28
                                          4

1  992, 1000 (9th Cir. 2004).  ///

2  ## DISCUSSION

3  **I.**   ***Batson/Wheeler* Motion**

4      **A.**   ***Facts***

5      Fregia claims that the trial court improperly denied three *Batson/Wheeler* motions

6  attacking the prosecution's challenges to African-American jurors.  Fregia claims that the

7  prosecution's proffered reasons were "patently pretextual, and some were demonstrably

8  implausible, and others were unsupported by the record." (Pet. Attach. p. 3.)  He also

9  asserts that the trial court "failed to make 'a sincere and reasoned effort' to evaluate the

10  prosecutor's stated reasons for his challenges." (*Id.* at p. 11.)  This Court will only address

11  the motion attacking the prosecution's peremptory challenge of Juror No. 19, Mr.

12  Williams, which is the only exhausted *Batson* claim in this action.[3]  Respondent asserts

13  that the prosecutor did not exercise racially discriminatory challenges during jury voir dire

14  and that the record supports the trial court's findings.

15      The California Court of Appeal summarized the facts with respect to this claim:

16      In his juror questionnaire, Juror No. 19 identified himself as a 20-year-old
17      African-American electrician who was a high school graduate.  He had
        been married for 17 months and had a seven-month-old child.  He and his
18      family lived with "friends or relatives."  For recreation, he enjoyed "family
        time" and watching sports.  He "seldom or never" read a newspaper.  His
19      wife was a day care provider, his father a chef, and his mother a florist.
20      Neither he nor any of his family members or close friends had ever been a
        suspect or a victim of crime, or been the victim of physical or sexual assault
21      or domestic violence.  Juror No. 19 had never served on a jury, and had no
22      opinions regarding defense lawyers or prosecutors.

23      In the death penalty portion of the questionnaire, Juror No. 19 indicated he
24      had never had conversations with others regarding the death penalty.  He
        responded to four specific death penalty questions as follows:

25

26  ──────────────
27  [3] Fregia's *Batson/Wheeler* claim before the state high court only addressed the challenge to
    Juror No. 19, (*see* Ans. Ex. 3 at 47), which was the only challenge analyzed by the state
    appellate court, (*id.*, Ex. 5), and rejected by the state high court, (*id.*, Ex. 6).

28                          5

United States District Court
Northern District of California

Question No. 97: "What are your general feelings and beliefs regarding the death penalty?"

Answer: "It all depends on the extent of the crime."

Question No. 98: "How would you rate your attitude towards the death penalty?"

Answer: "Don't know."

Question No. 99: "Check the entry which best describes your feeling about the death penalty."

Answer: "Will consider/undecided/haven't thought about it."

Question No. 100: "Have you ever had conversations with anyone regarding your beliefs on the death penalty?"

Answer: "No."

During voir dire, the prosecutor asked Juror No. 19 if he had "thought a lot about" the death penalty. Juror No. 19 answered, "Not really, no." After further questions, Juror No. 19 said he could impose the death penalty if it was supported by the evidence.

Defendant objected to the peremptory challenge of Juror No. 19 on *Wheeler* grounds. He argued he saw no reason for the challenge other than the fact that Juror No. 19 is African-American. The trial court found that defendant had satisfied the requirement of the first stage of *Wheeler*, i.e., had proved a prima facie case.

The prosecutor, who had previously remarked that Juror No. 19 looked "a little bit younger" than other jurors, explained the reasons for his peremptory challenge as follows:

"[Juror No. 19] is 20 years old. If you look at this panel, Judge, there are a lot of young people, so I had to be discriminating, at least to a certain extent, on where I draw the line on age.

"My difficulty with [Juror No. 19] is essentially twofold. One of them has to do with he's 20 years old. He's never been on a jury before. He did say that he could consider both options. He was very

United States District Court
Northern District of California

open about it.

"The fact that he's 20 and hasn't formed an opinion concerns me. He said that he didn't know or didn't have an opinion about the death penalty. He did say that he could consider both options. He was very open about it.

"And unlike some of the other young people on this panel that basically fall into two categories – there's the young people that have some prior jury to look at, or some sort of tie to law enforcement, or some indication that they've given this thought – [Juror No. 19] very openly said he hadn't really thought about this much, hadn't formed an opinion. And to go into a death penalty case with somebody who's never been on a jury before, who's 20 years old, that hasn't really considered this issue is very concerning to me.

"People who are young that don't know could be the product of two things: They've never thought about it, or they have not spent time with their parents forming their or shaping their opinions. That type of juror, in my opinion, is susceptible to influence from both sides on the issue. And they could change their view at that young age based on what other jurors are doing.

"There are other young jurors who at least have given an indication that they support it and also, through their answers, gave an indication that they have thought about it prior to the questionnaire and reflected on it between the questionnaire and coming to court. So in that respect that was my concern with [Juror No. 19].

"[M]y concern primarily in a death penalty case has to do with somebody who's 20 years old and doesn't know a position on the death penalty and hasn't considered it up to this stage."

Defendant argued that age should be considered a "protected class" under *Wheeler*, and that a lack of jury service is not surprising in a person as young as 20 and is therefore irrelevant. Defendant also argued that Juror No. 19's indecision about the death penalty shouldn't disqualify him, noting that Juror No. 19 had at least indicated on his questionnaire that some crimes deserved the death penalty and that he "has an opinion about mitigation."

The trial court denied defendant's *Wheeler* motion: "The Court finds that

the explanations given by [the prosecutor] are factually based and legally appropriate.

"Lack of life experience and a juror who has no prior thought of the death penalty I think are proper concerns of [the prosecutor], as well as [another reason for the peremptory challenge not relevant here]; although, I'd probably give more weight to the younger age of the juror, and here he is to make such a heavy decision with not having much of life experience as yet.

"So the Court finds that the explanation given by the prosecutor was the actual basis for the challenge, and the motion is denied." [FN9]

> FN9. The prosecutor had also given other explanations, most of them minor, which we need not discuss. The prosecutor explained his peremptory challenge was primarily based on the factors of youth and lack of a position on the death penalty. These are the two factors on which the trial court focused.

(Op. at 8-11.)

**B.    *Applicable Law***

The Equal Protection Clause forbids the exclusion of jurors by peremptory challenge solely on account of their race. *Batson v. Kentucky*, 476 U.S. 79, 89 (1986). *Batson* permits prompt rulings on objections to peremptory challenges under a three-step process. *See Hernandez v. New York*, 500 U.S. 352, 358 (1991); *Batson*, 476 U.S. at 96-97. First, the defendant must make out a *prima facie* case that the prosecutor exercised peremptory challenges on the basis of race "by showing that the totality of the relevant facts gives rise to an inference of discriminatory purpose." *Hernandez*, 500 U.S. at 358; *Batson*, 476 U.S. at 93-94. [4] However, if the trial court ruled on the ultimate question of intentional discrimination, a federal habeas court does not need to dwell on the first step because "the preliminary issue of whether the defendant ha[s] made a prima facie showing

---

[4] To establish a *prima facie* case, a petitioner must show that (1) the prospective juror who was removed is a member of a cognizable group, (2) the prosecutor exercised a peremptory challenge to remove the juror, and (3) "the facts and any other relevant circumstances raise an inference" that the challenge was motivated by race. *Cooperwood v. Cambra*, 245 F.3d 1042, 1046 (9th Cir. 2001).

United States District Court
Northern District of California

1   becomes moot." *Hernandez*, 500 U.S. at 359.

2        If the defendant makes a *prima facie* showing, the burden shifts to the prosecutor to

3   articulate a race-neutral explanation for striking the jurors in question. *Id.* at 358-59;

4   *Batson*, 476 U.S. at at 97. Finally, the trial court must determine whether the defendant

5   has carried his burden of proving purposeful discrimination. *Id.* at 98. The prosecutor

6   cannot meet this burden through "mere general assertions," but must demonstrate that

7   "permissible racially neutral selection criteria and procedures have produced the

8   monochromatic result." *Id.* at 94. Finally, the trial court must determine whether the

9   defendant has carried his burden of proving purposeful discrimination. *Id.* at 98; *see also*

10  *Hernandez*, 500 U.S. at 359; *Wade v. Terhune*, 202 F.3d 1190, 1195 (9th Cir. 2000). "To

11  fulfill its duty, the court must evaluate the prosecutor's proffered reasons and credibility

12  under the totality of the relevant facts, using all the available tools including its own

13  observations and the assistance of counsel." *Mitleider v. Hall*, 391 F.3d 1039, 1047 (9th

14  Cir. 2004); *Lewis v. Lewis*, 321 F.3d 824, 831 (9th Cir. 2003).

15       The findings of the state trial court on the issue of discriminatory intent are findings

16  of fact entitled to the presumption of correctness in federal habeas review. *See Purkett v.*

17  *Elem*, 514 U.S. 765, 769 (1995). So are the findings of the state appellate court.[5] *See*

18  *Mitleider*, 391 F.3d at 1050; *Williams v. Rhoades*, 354 F.3d 1101, 1108 (9th Cir. 2004).

19  This means that where a challenge to the state court's factual determination is based on

20  extrinsic evidence or evidence presented for the first time in federal court, under 28 U.S.C.

21  § 2254(e)(1) the state court's findings of discriminatory intent are presumed sound unless

22  the petitioner rebuts the presumption by clear and convincing evidence. *Kesser v. Cambra*,

23  

---

24  [5] The Ninth Circuit has opined in dicta that, unlike a trial court, a court of appeal is not in
    an ideal position to conduct a step-three evaluation. *Lewis*, 321 F.3d at 832. But even

25  *Lewis* acknowledged that a court of appeal is in a good position to use the trial court's
    findings and the evidence on the record to evaluate the support on the record for the

26  prosecutor's reasons and credibility, and to compare the struck and empaneled jurors. *Id.*;
    *accord Mitleider*, 391 F.3d at 1050 (affording presumption of correctness to state appellate

27  court's finding that prosecutor's proffered reasons and actual motives for challenging the
    juror were race-neutral).

28

465 F.3d 351, 368 n.1 (9th Cir. 2006).  Additionally, where review of the state court's

factual determination is based entirely on information that was contained in the state court

record, under 28 U.S.C. § 2254(d)(2) the federal court must defer to the state court's

conclusion that there was no discrimination unless that finding was "'based on an

unreasonable determination of the facts in light of the evidence presented in the State court

proceeding.'" *Cook v. Lamarque*, 593 F.3d 810, 816 (9th Cir. 2010) (citing 28 U.S.C. §

2254(d)(2)) (even though prosecutor gave both persuasive and unpersuasive justifications

for strikes, court could not conclude state court's finding of no discrimination was

objectively unreasonable where review of voir dire transcript and juror questionnaires

showed the most significant justifications in each case were entirely sound); *Kesser*, 465

F.3d at 368 (finding  California Court of Appeal's conclusion that a strike was not racially

based was unreasonable determination under 28 U.S.C. § 2254(d)(2), and "even satisfies

the more demanding standard" of § 2254(e)(1)).  Therefore, a federal habeas court can

only grant habeas relief "if it was unreasonable to credit the prosecutor's race-neutral

explanations for the *Batson* challenge." *Rice v. Collins*, 546 U.S. 333, 338 (2006).

C.   *Analysis*

    The state appellate court rejected this claim, finding no error in the trial court's

acceptance of the prosecutor's race-neutral explanations:

> In light of our deferential standard of review, we conclude that the trial court properly determined that the prosecutor's race-neutral explanations of youth and lack of a position on the death penalty were credible.

> Age is not a "protected class" under *Wheeler*. (*People v. Lewis* (2008) 43 Cal.4th 415, 482 (*Lewis*).)  Rather, the limited life experience of the young has been held to be a race-neutral explanation for a peremptory challenge. (*People v. Sims* (1993) 5 Cal.4th 405, 429-430; *People v. Gonzales* (2008) 165 Cal.App.4th 620, 631; *People v. Perez* (1994) 29 Cal.App.4th 1313, 1328.)  The prosecutor could legitimately have believed that a 20-year-old man lacked sufficient maturity to remain attentive to the evidence in a capital case and render a meaningful judgment on the issue of penalty, literally one of life and death.

So too, the prosecutor could legitimately believe that a prospective juror who had given little thought to the death penalty, and had not formed an opinion thereon, was not a suitable member of the jury panel in a capital case. Although Juror No. 19 ultimately said he could vote for the death penalty if the evidence supported it, the prosecutor was entitled to view the juror askance given his distinct lack of attitudinal attention to the issue of the ultimate sanction. Under these circumstances, the prosecutor could reasonably conclude that Juror No. 19 might be reluctant to vote for the death penalty when the time came for that momentous decision. (See, e.g., *Lewis, supra,* 43 Cal.4th at p. 473 [juror excused who "could probably" impose the death penalty, but had expressed reservations about it]; *People v. McDermott* (2002) 28 Cal.4th 946, 977-978 [juror excused who saw "no difference" in severity of punishment of death vs. life in prison].)

We accept the trial court's determination that Juror No. 19's youth and lack of a position on the death penalty were race-neutral explanations for the peremptory challenge. We also conclude the record shows the trial court made the necessary sincere and reasoned effort to evaluate the explanations. Based on the proffered explanations and the trial court's determination, we see no *Wheeler* error.

(Op. at 11-12.)

Here, the state appellate court's findings that the prosecutor's proffered reasons were race-neutral are presumed correct.[6] When his peremptory challenge was attacked based on race, the prosecutor responded at length. *See supra* at 6-7. The prosecutor's main reasons for exercising a peremptory challenge against Juror No. 19 was that he was young and lacked an opinion on the death penalty, which meant he might be reluctant to vote for such a sentence when the time came. *Id.* Defense counsel disputed the prosecutor's reasons by asserting that "age is a protected class" under *Wheeler*, and that Juror No. 19 did have some opinion on the death penalty because he had written on his

---

[6] Because the state appellate court assumed, without deciding, that Fregia had stated sufficient facts to support an inference of discrimination, this Court need not dwell on the first step of the *Batson* analysis. "Once a prosecutor has offered a race-neutral explanation for the peremptory challenges and the trial court has ruled on the ultimate question of intentional discrimination, the preliminary issue of whether the defendant has made a prima facie showing becomes moot." *Hernandez*, 500 U.S. at 359.

United States District Court
Northern District of California

United States District Court
Northern District of California

1    questionnaire that "he has an opinion about mitigation" and that "some crimes deserve the

2    death penalty." (11 RT 2668-2669.)[7]  Counsel concluded that the fact that Juror No. 19

3    had no position on the death penalty "[did] not make him an unfair juror for this case."

4    (*Id.* at 2669.)  The prosecution rebutted by pointing out that age is not a protected class

5    under *Wheeler*, which the state appellate court confirmed.  *See supra* at 10.  He also

6    pointed out that the only young prospective juror he did not intend to challenge was 21-

7    year-old male Mr. Smith, who had ties to law enforcement and prior jury service and had

8    shown solid support for the death penalty.  11 RT 2669.  Defense counsel's final argument

9    was that Mr. Smith, who was unemployed and living with his parents, seemed less mature

10   than Juror No. 19, who was a husband and a father.  11 RT 2670.  The record clearly

11   shows that the trial court allowed the parties to argue the motion at length and was actively

12   engaged throughout the *Batson/Wheeler* motion.  The state appellate court reasonably

13   concluded that "the record shows the trial court made the necessary sincere and reasoned

14   effort to evaluate the explanations." *See supra* at 11.  Under the totality of the relevant

15   facts, the trial court denied Fregia's motion because it found the prosecution's reasons

16   were "factually based and legally appropriate." *See supra* at 7-8; *Mitleider*, 391 F.3d at

17   1047; *Lewis*, 321 F.3d at 831.  Lastly, the state court's findings of discriminatory intent are

18   presumed sound unless the petitioner rebuts the presumption by clear and convincing

19   evidence. *Kesser*, 465 F.3d at 368 n.1.  Fregia has failed to do so.  Accordingly, the state

20   court's findings were not an unreasonable determination of the facts in light of the

21   evidence presented. *Cook v. Lamarque*, 593 F.3d at 816.  Fregia has failed to show that

22   the state court was unreasonable to credit the prosecutor's race-neutral explanations. *Rice*

23   *v. Collins*, 546 U.S. at 338.

24        The state appellate court also considered Fregia's argument that the prosecutor's

25

26   ───────────────────

27   [7] 11 RT 2668-2669 refers to the Reporter's Transcript, (Ans. Ex. 2), Volume 11, pages
     2668 through 2669.  The Court will use a similar citation form for other references to the
     Reporter's Transcript ("RT") and the Clerk's Transcript ("CT") (Ans. Ex. 1).

28                                              12

1 stated reasons for excusing Juror No. 19 were not credible based on a comparative

2 analysis. One of the main ways that a court could consider a petitioner's *Batson* claim in

3 light of the "totality of the relevant facts" is by assessing "all relevant circumstances"

4 surrounding the challenged peremptory strike and engaging in comparative juror analysis.

5 *Boyd v. Newland*, 467 F.3d 1139, 1147-48 (9th Cir. 2006) (citing *Batson*, 476 U.S. at 96).[8]

6 Comparative juror analysis -- i.e., determining whether non-challenged jurors possess any

7 of the characteristics on which the prosecution challenged jurors in the protected group --

8 may tend to prove discrimination at the third *Batson* step. *Snyder v. Louisiana*, 552 U.S. at

9 484-85 (2008); *Miller-El v. Dretke*, 545 U.S. 231, 242-43 (2005)[9]; *Kesser*, 465 F.3d at

10 360; *Sims v. Brown*, 425 F.3d 560, 577 (9th Cir.), *amended*, 430 F.3d 1220 (9th Cir. 2005);

11 *United States v. You*, 382 F.3d 958, 968-69 (9th Cir. 2004). This comparative analysis

12 may include the jury voir dire and the jury questionnaires of all venire members, not just

13 those venire members stricken. *Green v. Lamarque*, 532 F.3d 1028, 1030 (9th Cir. 2008)

14 (citations omitted).[10]

15    The state appellate court was unpersuaded and rejected the claim on this basis:

16    Defendant invites us to find error based on comparative juror analysis.
17    Generally speaking, such an analysis would involve comparing the
18    explanations for excusing African-American prospective jurors with
    relevant characteristics of non African-American prospective jurors,
19    especially those who were not excused. (See *Lenix, supra*, 44 Cal.4th at pp.

---

[8] A court could also look at percentages. *Boyd*, 467 F.3d at 1147.

[9] "[T]he principles expounded in *Miller-El* were clearly established Supreme Court law for AEDPA purposes at least by the time of the last reasoned state court decision in *Miller-El*, handed down in 1992[.]" *Kesser*, 465 F.3d at 360.

[10] *See also Crittenden v. Ayers*, 620 F.3d 962, 974-75 (9th Cir. 2010) (finding that a black defendant had made a *prima facie* showing after a comparative juror analysis between an African-American prospective juror who was removed based on prosecutor's use of a peremptory challenge and her replacement who was a white woman showed that although they were demographically similar, apart from their race, and they both expressed general opposition to the death penalty and hesitancy about its imposition during voir dire, the prosecutor gave them widely different ratings in his notes as desirable jurors which is sufficient to raise the inference of racial motivation).

13

621-622.) Comparative juror analysis is "but one form of circumstantial evidence that is relevant, but not necessarily dispositive, on the issue of intentional discrimination." (*Id.* at p. 622.) Our Supreme Court has strongly suggested that such analysis, standing alone, cannot be a basis for a finding of *Wheeler* error. (*Id.* at p. 626.) And comparative juror analysis does not dilute our deferential standard of review, especially where – as here – such analysis is performed for the first time on appeal on a cold appellate record. (*Id.* at pp. 622-628.) In any case, a comparative analysis does not cast a shadow of doubt on the exercise of the peremptory challenge to Juror No. 19.

Youth. Other than Juror No. 19, there were five prospective jurors who were 26 or younger. Defendant concedes that the prosecutor exercised peremptory challenges against four of these five, leaving only Juror No. 42. This strongly suggests youth was a legitimate concern for the prosecutor in his approach to the composition of the jury panel. Indeed, three of the four young jurors excused by the prosecutor seemed inclined to *favor* the prosecution – they had positive views of police officers and favorable opinions of the death penalty. The fourth was similar to Juror No. 19 in that she had no opinion about the death penalty.

The race neutrality of the explanation of youth is further reinforced by examination of Juror No. 42. He appeared to be particularly favorable to the prosecution, in that he supported the death penalty, believed it was always appropriate in certain circumstances, had ties to law enforcement, and believed police officers were less likely to lie than other witnesses. It appears the factor of youth was trumped by the prospective juror's perceived favorability to the prosecution. Indeed, Juror No. 42 was excused by the defense.

Lack of Position on the Death Penalty. Defendant points to two jurors not challenged by the prosecutor, Juror No. 37 and Juror No. 170, and argues they had an attitude about the death penalty similar to Juror No. 19. Defendant concludes that given this comparative similarity, the explanation based on Juror No. 19's attitude toward the death penalty was a pretext for a peremptory challenge based on race.

This argument does not withstand scrutiny. While both jurors had written on their questionnaires that they did not know or had not thought about their attitudes toward the death penalty, both revealed a positive attitude toward the death penalty during voir dire. Juror No. 37 said she could impose the death penalty after weighing all the facts. Juror No. 170 said imposing the death penalty was "extremely serious," but she could impose

it.   Moreover, both jurors exhibited characteristics which would have endeared them to the prosecution.  Juror No. 37 was 63 and had worked for or with a number of law enforcement agencies.  Her son was a sheriff's deputy.  She had been the victim of domestic violence.  Juror No. 170 was 47, described herself as politically conservative, and had been the victim of family sexual abuse when she was young.

We conclude that comparative juror analysis does not reveal evidence that the peremptory challenge of Juror No. 19 was based on race.

Defendant has not demonstrated *Wheeler* error.

(Op. at 12-14.)

Fregia's claim that the prosecutor had discriminatory motives for excusing Juror No. 19 based on comparative juror analysis is without merit.  Because the state appellate court's factual findings are entitled to a presumption of correctness, *see Purkett*, 514 U.S. at 769, petitioner may only succeed on this claim if he rebuts the presumption by clear and convincing evidence.  *Kesser*, 465 F.3d at 368.  Furthermore, we must defer to the state court's conclusion that there was no discrimination unless that finding was "'based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.'"  *Cook v. Lamarque*, 593 F.3d at 816.  The state appellate court carefully reviewed the record of the voir dire in considering Fregia's argument and found that youth was a legitimate, non-racial basis for the prosecution's exercise of his peremptory challenge.  There were five other prospective jurors who were 26 years of age or younger and the prosecutor exercised peremptory challenges against four of them, despite the fact that three of the four seemed inclined to "favor" the prosecution while the fourth had no opinion about the death penalty.  *See supra* at 13-14.  The remaining young juror – Juror No. 42 – appeared to be "particularly favorable" to the prosecution, and was understandably excused by the defense.  *Id.* at 14.  The court concluded that "[i]t appears the factor of youth was trumped by the prospective juror's perceived favorability to the prosecution."  (*Id.*)   Accordingly, the court's rejection of Fregia's claim that youth was a pretextual basis for exercising peremptory challenges was not unreasonable.

15

1   The facts also support the court's conclusion that Juror No. 37 and Juror No. 170

2   were not comparable to Juror No. 19 as Fregia suggests.  Although these jurors indicated

3   no position on the death penalty on their questionnaires, they revealed a positive attitude

4   during voir dire: Juror No. 37 said "she could impose the death penalty after weighing all

5   the facts"; and Juror No. 170 said although imposing the death penalty was "'extremely

6   serious,'" "she could impose it." *See supra* at 14.  Furthermore, the jurors had

7   characteristics that would endear them to the prosecution: 1) Juror No. 37(63 years old)

8   had worked for or with a number of law enforcement agencies, her son was a sheriff's

9   deputy, and she was a victim of domestic violence; and 2) Juror No. 170 (47 years old)

10  was politically conservative and had been the victim of family sexual abuse when she was

11  young. *Id.*  Against these findings based on a thorough review of the voir dire record,

12  Fregia has failed to show that the state appellate court's conclusion was incorrect by clear

13  and convincing evidence. *Kesser*, 465 F.3d at 368.  Fregia has failed to carry his burden of

14  proving purposeful discrimination. *Batson*, 476 U.S. at 97.  The state courts' rejection of

15  this claim was not based on an unreasonable determination of the facts in light of the

16  evidence presented.  28 U.S.C. § 2254(d)(2).  Accordingly, Fregia is not entitled to habeas

17  relief on this claim.

18  **II.    Prosecutorial Misconduct**

19          **A.** *Facts*

20          Fregia claims that "the prosecutor committed misconduct when he argued to the

21  jury that, petitioner had '[n]othing to lose,' if he testified falsely; and that the petitioner

22  'lied to all of you on more than one occasion.' (19 RT 4467[])."  (Pet. Attach. 15.)  Fregia

23  also claims that the prosecutor made inappropriate statements during closing argument that

24  "appealed to passion and prejudice, instead of the evidence relevant to the crimes

25  charged." (*Id.* at 16.)

26          The state appellate court summarized the facts regarding the first claim:

27          Defendant contends the prosecutor engaged in prejudicial misconduct

28                                                      16

during closing argument to the jury at the guilt phase of the trial. He concedes that any prejudice would not affect the felony-murder convictions, on which he admitted guilt before the jury, but argues that prejudicial misconduct goes to the issue of his intent to kill or cause harm, and thus would affect his convictions for mayhem, arson, and attempted voluntary manslaughter, as well as the kidnapping special circumstance.

Given defendant's admission in his testimony to the felony murder of the two children, the prosecutor's closing argument focused on the issue of defendant's intent to set the fire, as pertinent to the issue of his intent to kill or maim Weaver. The prosecutor noted that the evidence against defendant came from independent witnesses and scientific analysis. The prosecutor then compared the prosecution evidence with defendant's testimony: "You got to see the defendant testify. Now, I'm going to get to this a lot more in-depth later. But in prefatory comments, let me just say: *I submit to you that he got on that stand and lied to all of you on more than one occasion.*

"And you have to remember something. He's the one who's on trial here today. He's the one facing charges of murdering his two children, attempting to kill the mother of those children, aggravated mayhem on her. It's his fate you folks decide today. *He's got nothing to lose. Nothing. Nothing.* He's had four years to sit there and think about his testimony. He's had all these expensive experts to come in and, I guess, help. But he's had all this time." (Italics added.)

Defendant did not object to this argument.

During his argument, defense counsel admitted that defendant was guilty of the felony murders of Daelin and Devlin, as well as kidnapping and carjacking. But defense counsel argued the ignition of the gasoline was not intentional, so that defendant was not guilty of the attempted premeditated murder of Weaver, intentional arson, or aggravated mayhem.

At one point, defense counsel argued: "Now, as I say, the evidence is more than adequate to convict Mark Fregia of two murders. So I'm not gonna try and take you down some false path of critical reasoning in the hope that Mark Fregia is going to get walked out the door. He doesn't want that. He's never asked for it. *He should spend the rest of his life in prison.* [Italics added.]

"[PROSECUTOR]: Objections, your Honor. Improper argument. Goes to penalty or punishment.

"[THE COURT]": Yeah, that last phrase does."

Later in this argument, defense counsel responded to the prosecutor's "nothing to lose" argument: "So, how does the prosecutor handle this? Predictably, he calls Mark Fregia a liar. Mark's a liar. Lies repeatedly. That's how the prosecutor handles that. That's what he says.

"*And he asserts to you in a serious tone of voice that Mark has nothing to lose. He has nothing to lose. He took the stand and lied because he has nothing to lose.* That's what the D.A. told you. [Italics added.]

"Well, we take a different view. *Mark Fregia, in our opinion, has everything to lose.* He knows, like we know, that if you believe him to be a liar, you will hold him in a negative light. He knows his fate is in your hands, and he knows that if you say he's a perjurer, that he's unbelievable, *that the eventual outcome for him could be death.* [Italics added.]

"[PROSECUTOR]: Objection, your Honor; this is completely inappropriate.

"[THE COURT]: That last statement was inappropriate at this juncture, and that will be stricken. Ladies and gentlemen [of the jury], you're not to consider that last statement, please." [Italics added.]

In his rebuttal, the prosecutor asked the jurors to ignore the issue of punishment: "Now, see I'm not gonna stand here and impugn the integrity of officers of the court or the defense attorneys. I'm not going to. See, the issue here is not the attorneys involved because they've got a difficult task, and there's a lot more going on here. You can tell from [defense counsel's] whole argument, this case, what they talk about has nothing to do with the guilt phase. *That's why [defense counsel] several times inappropriately brought up penalty, which you can't consider. That's why he did it. He's into talking to you about penalty.*" [Italics added.]

Defendant did not object to this argument.

(Op. at 14-16.)

### B. *Applicable Law*

A defendant's due process rights are violated when a prosecutor's misconduct renders a trial "fundamentally unfair." *Darden v. Wainwright*, 477 U.S. 168, 181 (1986); *Smith v. Phillips*, 455 U.S. 209, 219 (1982) ("the touchstone of due process analysis in

1   cases of alleged prosecutorial misconduct is the fairness of the trial, not the culpability of

2   the prosecutor"). Under *Darden*, the first issue is whether the prosecutor's remarks were

3   improper; if so, the next question is whether such conduct infected the trial with

4   unfairness. *Tan v. Runnels*, 413 F.3d 1101, 1112 (9th Cir. 2005). A prosecutorial

5   misconduct claim is decided "'on the merits, examining the entire proceedings to

6   determine whether the prosecutor's remarks so infected the trial with unfairness as to make

7   the resulting conviction a denial of due process.'" *Johnson v. Sublett*, 63 F.3d 926, 929

8   (9th Cir.) (citation omitted), *cert. denied*, 516 U.S. 1017 (1995).

9          The first factor in determining misconduct amounted to a violation of due process is

10  whether the trial court issued a curative instruction. When a curative instruction is issued,

11  a court presumes that the jury has disregarded inadmissible evidence and that no due

12  process violation occurred. *See Greer v. Miller*, 483 U.S. 756, 766 n.8 (1987); *Darden*,

13  477 U.S. at 182 (the Court condemned egregious, inflammatory comments by the

14  prosecutor but held that the trial was fair since curative actions were taken by the trial

15  judge); *Tan*, 413 F.3d at 1115 ("we presume jurors follow the court's instructions absent

16  extraordinary circumstances"). This presumption may be overcome if there is an

17  "overwhelming probability" that the jury would be unable to disregard evidence and a

18  strong likelihood that the effect of the misconduct would be "devastating" to the defendant.

19  *See Greer*, 483 U.S. at 766 n.8; *Tan*, 413 F.3d at 1115-16 (finding trial fair where jury

20  received instructions five different times to consider only the evidence presented, and not

21  its sympathy for the victim's life story).

22         Other factors which a court may take into account in determining whether

23  misconduct rises to a level of due process violation are: (1) the weight of evidence of guilt,

24  *compare United States v. Young*, 470 U.S. 1, 19 (1985) (finding "overwhelming" evidence

25  of guilt) *with United States v. Schuler*, 813 F.2d 978, 982 (9th Cir. 1987) (in light of prior

26  hung jury and lack of curative instruction, new trial required after prosecutor's reference to

27  defendant's courtroom demeanor); (2) whether the misconduct was isolated or part of an

28

United States District Court
Northern District of California

1   ongoing pattern, *see Lincoln v. Sunn*, 807 F.2d 805, 809 (9th Cir. 1987); (3) whether the

2   misconduct relates to a critical part of the case, *see Giglio v. United States*, 405 U.S. 150,

3   154 (1972) (failure to disclose information showing potential bias of witness especially

4   significant because government's case rested on credibility of that witness); and (4)

5   whether a prosecutor's comment misstates or manipulates the evidence, *see Darden*, 477

6   U.S. at 182.

7       *C. Analysis*

8       Notwithstanding Fregia's failure to preserve this claim on appeal, the California

9   Court of Appeal rejected it on the merits[11]:

10      Defendant now contends the prosecutor committed misconduct in two
11      ways. He claims the "nothing to lose" argument amounted to knowingly
        arguing a false inference to the jury, and that the prosecutor improperly
12      denigrated defense counsel by arguing that the latter's references to penalty
13      were improper.

14      These arguments have not been preserved for appeal, because the
        challenged prosecutorial arguments were not objected to. (See *People v.*
15      *Hill* (1998) 17 Cal.4th 800, 820.) There is no indication that an objection
16      or admonition would have been futile. (See *id.* at pp. 820-821.)

17      In any case, the arguments lack merit. While a prosecutor may not
18      knowingly argue a false inference to the jury, (see, e.g., *People v. Bittaker*
        (1989) 48 Cal.3d 1046, 1104-1105), we fail to see how a prosecutor argues
19      a false inference by proposing that a defendant facing execution might
        fabricate or dissemble to avoid that ultimate sanction. Under the
20      circumstances of this case, defendant indeed had "nothing to lose" – and his
21      life, albeit forever in prison, to gain – by using fiction to paint himself and

22

23  [11] Although claims of prosecutorial misconduct must be objected to at trial in order to be
    preserved upon appeal, *see People v. Fosselman*, 33 Cal. 3d 572, 580-81 (1983), a
24  petitioner is not barred and therefore does not have to show cause and prejudice when a
    reviewing state court overlooks the procedural default and considers the claim on the
25  merits. *See Thomas v. Hubbard*, 273 F.3d 1164, 1176 (9th Cir. 2002) (holding that alleged
    procedural default was no bar to claim where state court addressed procedural default issue
26  but left resolution of the issue uncertain, failing to make a clear and express statement that
    its decision was based on a procedural default). Because the state appellate court went
27  ahead and ruled on the merits of this claim despite Fregia's failure to object at trial, the
    Court may review the claim on the merits.

28

United States District Court
Northern District of California

his story in the best possible light. It was not improper argument to point that out to the jury. Defendant's credibility was squarely in issue. (See, e.g., *People v. Rundle* (2008) 43 Cal.4th 76, 163, disapproved on unrelated grounds *People v. Doolin* (2009) 45 Cal.4th 390, 421, fn. 22.)

Likewise, it did not denigrate defense counsel to point out that his references to penalty were improper. Penalty is generally irrelevant to the issue of guilt. (*People v. Allen* (1973) 29 Cal.App.3d 932, 936-937.) It was proper comment, and certainly not impermissible denigration, for the prosecutor to note defense counsel's improper references to penalty. Impermissible denigration of opposing counsel is of a far greater magnitude than the challenged argument in this case. (See, e.g., *People v. Huggins* (2006) 38 Cal.4th 175, 207; *People v. Bell* (1989) 49 Cal.3d 502, 538.)

We find no prosecutorial misconduct in closing argument. [FN10]

> FN10.   Defendant also challenges prosecutorial argument which asked the jurors to, in essence, put themselves in the position of Weaver and the two children and imagine their suffering. Defendant claims this was an impermissible appeal to the passion and prejudice of the jury. Any error was harmless in light of the overwhelming evidence. Arguments of this nature have been repeatedly found to be not prejudicial. (See, e.g., *People v. Stansbury* (1993) 4 Cal.4th 1017, 1057, reversed on other grounds *Stansbury v. California* (1994) 511 U.S. 318; *People v. Pensinger* (1991) 52 Cal.3d 1210, 1250-1251; *People v. Fields* (1983) 35 Cal.3d 329, 362-363.)

(Op. at 14-17.)

Fregia's first claim that the prosecutor inappropriately implied that he was lying on the stand is without merit. Although a prosecutor may not voice doubt about the veracity of a defendant who testifies, particularly in instances of flatly contradictory testimony, he may refer to the defendant as a "liar" as long as the prosecutor is simply asking the jury to make such an inference from the evidence. *United States v. Moreland*, 604 F.3d 1058, 1072-73 (9th Cir. 2010) (citations and internal quotations omitted) (finding repeated references to defendant as "liar" proper prosecutor was commenting on specific inconsistencies in the evidence presented) (citations omitted). There was sufficient evidence for the prosecutor to suggest the inference to the jury that Fregia was lying. Specifically, the evidence supported the inference that Fregia acted with malice,

premeditation and deliberation to kill Weaver rather than intending to merely "scare" her as Fregia claimed: (1) he made threats to kill Weaver in the days immediately before the incident; (2) he left home with a knife on the morning of the incident; (3) he purchased two liters of gasoline the same day; (4) he drenched Weaver with gasoline and lit a lighter within a foot of her body; and (5) Fregia appeared indifferent to the suffering of Weaver and the children during and after the fire. 19 RT 4484, 4488-4493; 4509-4517. Furthermore, the record shows that much of the evidence against Fregia came from disinterested witnesses and was corroborated by scientific evidence while most of the evidence for the defense was Fregia's own testimony. *See supra* at 2-3. Clearly, Fregia's credibility was at issue. But even if we assume that all of the prosecutor's comments were improper, they did not rise to the level of a constitutional violation. As discussed above, the weight of the evidence against Fregia was substantial. Secondly, the misconduct was isolated and not part of an ongoing pattern as they were made only during closing argument. Lastly, the prosecutor's comments did not misstate or manipulate the evidence. These factors indicate that the misconduct did not rise to the level of a constitutional violation. *See Darden*, 477 U.S. at 182.

Fregia's second claim of prosecutorial misconduct is also without merit. During closing argument, defense counsel objected to the prosecutor's comments describing the reactions of witnesses who were present at the incident, the seriousness of Weaver's injuries, and the suffering of the children as improper appeals "to passion and prejudice." 19 RT 4445-4448. After the first objection, the trial court admonished the jury that while "lawyers are allowed to make reference from the evidence, logical inferences that they believe can be deducted," "they cannot appeal to your emotions, your sympathies, et cetera." *Id.* at 4446. Thereafter, the trial court continued to overrule defense counsel's several objections based on the same grounds. The Court of Appeal found any error harmless "in light of the overwhelming evidence." *See supra* at 21. The state court's rejection of this claim was not unreasonable because a prosecutor's arguing facts supported

United States District Court
Northern District of California

United States District Court
Northern District of California

1  by the record and relevant to the charges, as in Fregia's case, do not constitute a prohibited

2  appeal to the jury's emotions, passions, or sympathy for the victim. *Tan v. Runnels*, 413

3  F.3d 1101, 1113, 1115 (9th Cir. 2005). Furthermore, under *Brecht v. Abrahamson.,* habeas

4  petitioners are not entitled to habeas relief based on trial error unless they can establish that

5  it resulted in "'actual'" prejudice. 507 U.S. 619, 637 (1993) (citing *United States v. Lane*,

6  474 U.S. 438, 449 (1986)); *Johnson v. Sublett*, 63 F.3d at 930 (finding prosecutorial

7  vouching "could not have had substantial impact on the verdict necessary to establish

8  reversible constitutional error" under *Brecht*). Based on the substantial evidence against

9  Fregia discussed above, *see supra* at 21-22, the Court is not convinced that he was

10  prejudiced by prosecutor's comments; this lack of prejudice is supported by the fact that

11  the jury convicted Fregia of the lesser included offense of attempted voluntary

12  manslaughter rather than premeditated murder.

13       Finally, any inappropriate statements by the prosecution were inoculated by the jury

14  instructions, which included the instruction that the jury was to determine the facts from

15  the evidence presented at trial and that statements made by the attorneys were not

16  evidence. 3 CT 763, 768; 19 RT 4621-4622, 4624; 20 RT 4710, 4718-4719. The jury is

17  presumed to have followed the trial court's instructions. *See Richardson*

18  *v. Marsh*, 481 U.S. 200, 206 (1987). Fregia has failed to overcome this presumption by

19  showing with "overwhelming probability" that the jury was unable to disregard the

20  evidence or that there was a strong likelihood that the effect of the misconduct was

21  "devastating" to him. *See Greer*, 483 U.S. at 766 n.8. Rather, the jury convicted Fregia of

22  attempted voluntary manslaughter of Weaver rather than attempted premeditated murder,

23  which indicates that the jury gave some credence to Fregia's version of events

24  notwithstanding the prosecutor's remarks. Accordingly, it cannot be said that the

25  prosecutor's remarks "so infected the trial with unfairness as to make the resulting

26  conviction a denial of due process." *Sublett*, 63 F.3d at 929.

27       The state court's rejection of Fregia's prosecutorial misconduct claims was

28  23

1   reasonable and is entitled to AEDPA deference.  Accordingly, the claim is DENIED.

2                                **CONCLUSION**

3           The state courts' adjudication of Fregia's claims did not result in decisions that

4   were contrary to, or involved an unreasonable application of, clearly established federal

5   law, nor did they result in decisions that were based on an unreasonable determination of

6   the facts in light of the evidence presented in the state court proceeding.  Accordingly, the

7   petition is DENIED.

8           A certificate of appealability will not issue.  Reasonable jurists would not "find the

9   district court's assessment of the constitutional claims debatable or wrong."  *Slack v.*

10  *McDaniel*, 529 U.S. 473, 484 (2000).  Fregia may seek a certificate of appealability from

11  the Ninth Circuit.

12          The Clerk shall enter judgment in favor of respondent and close the file.

13          **IT IS SO ORDERED.**

14  **Dated:** February 7, 2014

                                        WILLIAM H. ORRICK
                                        United States District Judge

UNITED STATES DISTRICT COURT

FOR THE

NORTHERN DISTRICT OF CALIFORNIA

MARK ANTHONY FREGIA,

             Plaintiff,

   v.

MIKE MCDONALD et al,

             Defendant.

_____/

Case Number: CV11-03595 WHO

**CERTIFICATE OF SERVICE**

I, the undersigned, hereby certify that I am an employee in the Office of the Clerk, U.S. District Court, Northern District of California.

That on February 7, 2014, I SERVED a true and correct copy of the attached, by placing said copy in a postage paid envelope addressed to the person hereinafter listed, by depositing said envelope in the U.S. Mail.

Mark Anthony Fregia G-07230
High Desert State Prison
P.O. Box 3030
Susanville, CA 96127

Dated: February 7, 2014

Richard W. Wieking, Clerk
By: Jean Davis, Deputy Clerk